## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**WESTGATE PRODUCTS, LLC**
50 W Fernau Ave
Oshkosh, WI 54901

**WESTGATE CUPS, LTD.**
50 W. Fernau Ave.
Oshkosh, WI 54901

Case No._____

**WESTGATE PRINTING, LLC**
50 W. Fernau Ave.
Oshkosh, WI 54901

v.

**CAREY EDWARDS**
2311 Dartmouth Bend DR
Wildwood, MO 63001

## COMPLAINT

     **NOW COMES** the above named Plaintiffs, Westgate Products, LLC, Westgate Cups, LTD. and Westgate Printing, LLC, by and through their attorneys, Sitzmann Law Firm Ltd., complaining of the above-named Defendant, allege and state as follows:

### THE PARTIES

1. Plaintiff, Westgate Products, LLC, is a Wisconsin Limited Liability Company whose registered office is located at 50 W. Fernau Ave., Oshkosh, Wisconsin, 54901 and whose registered agent is Patrick Carroll. The phone number for Mr. Carroll at Westgate is (847) 274-6002 and his email address is pcarroll@westgateproducts.com

2. Plaintiff, Westgate Cups, LTD, is a Wisconsin Corporation whose registered office is located at 50 W. Fernau Ave., Oshkosh, Wisconsin, 54901 and whose registered agent is Patrick

Carroll. The phone number for Mr. Carroll at Westgate Cups is (847) 274-6002 and his email address is pcarroll@westgateproducts.com.

3. Plaintiff, Westgate Printing, LLC, is a Wisconsin Limited Liability Company whose registered office is located at 50 W. Fernau Ave., Oshkosh, Wisconsin, 54901 and whose registered agent is Patrick Carroll. The phone number for Mr. Carroll at Westgate Cups is (847) 274-6002 and his email address is pcarroll@westgateproducts.com.

4. The Defendant, Carey Edwards (hereinafter "Edwards") is an adult resident of the state of: Missouri. His address is 2311 Dartmouth Bend Dr., Wildwood, Missouri 63011. The phone number for Edwards is (314)-809-3039 and his email address is carey@veripac.com.

## JURISDICTION

5. Plaintiff, Westgate Products, is a limited liability company formed under the laws of the State of Wisconsin and has its principal place of business in the State of Wisconsin.

6. Plaintiff, Westgate Cups, is a corporation formed under the laws of the State of Wisconsin and has its principal place of business in the State of Wisconsin.

7. Plaintiff, Westgate Printing, is a corporation formed under the laws of the State of Wisconsin and has its principal place of business in the State of Wisconsin.

8. The defendant, Edwards, is a citizen of the State of Missouri.

9. The amount in controversy is more than $75,000.00, not counting interest and costs of court as is set forth in the allegations herein.

## STATEMENT OF CLAIM – ALLEGATIONS

### General Allegations

10. Westgate Cups is a company which sells packaging such as cups and food buckets to various food service customers.

11. Westgate Cups operates its business as Westgate Products.

2

12. Westgate Printing is a Wisconsin Limited Liability Company which is wholly owned by Westgate Cups.

13. Westgate Printing is the entity through which Westgate Products/Westgate Cups paid Edwards.

14. Hereinafter in this Complaint, Plaintiffs will collectively be referred to as WESTGATE.

15. In May of 2013, Edwards began work for WESTGATE operating as an independent contractor/agent.

16. Edwards had the authority to act on WESTGATE's behalf within his sales role capacity.

17. Edwards was to be the person primarily responsible for WESTGATE sales.

18. There was no written agreement between Edwards and WESTGATE.

19. As compensation, WESTGATE agreed to pay Edwards the amount of $208,000.00 per year for his services.

20. WESTGATE also provided Edwards a car to be used primarily for duties associated with the services he was to provide to WESTGATE.

21. WESTGATE paid sales tax on the car in the amount of **$4,026.76**

22. WESTGATE paid car payments on the car in the amount of **$10,942.60** per year.

23. Edwards's wife Sheri was provided an entry level customer service job as an employee of WESTGATE and was trained to perform that task.

24. Edwards's wife Sheri was paid by WESTGATE the sum of $62,500.00 year

25. Edwards, his wife and children were provided health care insurance 100% funded by WESTGATE through Sheri's job at $18,036.00 year.

26. Edwards was given a WESTGATE credit card to use for purposes of furthering the services he was to perform on behalf of his agreement with WESTGATE.

27. Edwards was provided the WESTGATE email address of cedwards@westgateproducts.com.

3

28. It was understood that the cedwards@westagteproducts.com email was the only email address to be used by Edwards in conducting Westgate business.

29. It was understood between WESTGATE and Edwards that Edwards was to provide services exclusively on behalf of and for the benefit of WESTGATE.

30. At all times Edwards was being paid by WESTGATE, Edwards represented to WESTGATE that Edwards was exclusively working on behalf of WESTGATE.

31. WESTGATE terminated its agreement with Edwards in May of 2018.

32. Upon termination of the agreement between Edwards and WESTGATE, WESTGATE learned that Edwards had been using the Westgate credit card to pay for a significant amount of personal or other use that had nothing to do with the work he was providing for WESTGATE and which had not been approved by WESTGATE.

33. Upon termination of the agreement between Edwards and WESTGATE, WESTGATE learned that Edwards had been self-dealing on WESTGATE related matters while he was supposed to be exclusively performing said work for WESTGATE.

34. Upon information and belief, Edwards was using non-WESTGATE email addresses to conduct business with WESTGATE customers and vendors.

35. Edwards had only used his WESTGATE email account to communicate internally with WESTGATE.

36. WESTGATE was unaware that Edwards was using non-WESTGATE email addresses to communicate with WESTGATE's customers and vendors.

37. Upon termination of the agreement WESTGATE learned that Edwards acted with both gross negligence and with lack of adequate disclosure and representation pursuant to transactions Edwards had handled.

38. Upon termination of the agreement between Edwards and WESTGATE, WESTGATE learned that Edwards had executed contractual agreements between WESTGATE and third-parties without authorization from WESTGATE.

39. WESTGATE sustained damages as a result of the contracts Edwards entered into on WESTGATE's behalf without WESTGATE's authority.

## Claim 1 - Theft

40. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 39 above.

41. Edwards was provided with a WESTGATE credit card to be used in conjunction with Edwards providing services to WESTGATE in a sales capacity.

42. Edwards used WESTGATE's credit card for personal or other use that had nothing to do with the work he was to provide WESTGATE.

43. Edwards's personal or other use of WESTGATE's credit card that had nothing to do with the work he was providing WESTGATE was not authorized by WESTGATE.

44. From 2015 through 2018, Edwards used WESTGATE's credit card to pay for concerts to see artists such as Britney Spears, Florida Georgia Line, Journey, Jason Aldean, Def Leppard, Nickelback, Boston and others.

45. Edwards did not have WESTGATE's authorization to use WESTGATE's credit card to purchase concert tickets for Edwards' personal use or other use that had nothing to do with the work he was providing WESTGATE.

46. From 2015 through 2018, Edwards used WESTGATE's credit card to pay for him to attend multiple sporting events such as Dallas Cowboys games, St. Louis Cardinals games, Kansas City Royals games.

47. Edwards did not have WESTGATE's authorization to use WESTGATE's credit card to purchase tickets to sporting events for Edwards' personal use or other use that had nothing to do with the work he was providing WESTGATE.

5

48. From 2015 through 2018, Edwards, without WESTGATE's permission, charged **$46,226.85** to WESTGATE's credit card to attend concerts and sporting events for personal or other use that had nothing to do with the work he was providing for WESTGATE.

49. In 2016 and 2017, Edwards used WESTGATE's credit cards, without WESTGATE's permission, at "gentlemen's clubs" (i.e. strip clubs) for personal or other use that had nothing to do with the work he was providing for WESTGATE.

50. In 2016 and 2017, Edwards charged **$6,892.92** to WESTGATE's credit card at 'gentlemen's clubs' without WESTGATE's authorization and for his personal or other use that had nothing to do with the work he was providing for WESTGATE.

51. From 2015 through 2018, Edwards charged WESTGATE's credit cards at casinos without WESTGATE's authorization for personal or other use that had nothing to do with the work he was providing for WESTGATE.

52. From 2016 through 2018, Edwards charged **$3,872.65** to WESTGATE's credit card at Casino's without WESTGATE's authorization and for his personal or other use that had nothing to do with the work he was providing for WESTGATE.

53. In 2015 through 2017, Edwards charged WESTGATE's credit card without WESTGATE's authorization for luxury party limousines for personal or other use that had nothing to do with the work he was providing for WESTGATE.

54. From 2015 through 2018, Edwards charged **$3780.46 to** WESTGATE's credit cards without WESTGATE's authorization for luxury party limousines for personal or other use that had nothing to do with the work he was providing for WESTGATE.

55. Edwards charged **$3,875.38** to WESTGATE's credit cards without WESTGATE's authorization for repairs to his wife's BMW car or other use that had nothing to do with the work he was providing for WESTGATE.

56. WESTGATE never authorized Edwards to use its credit card to pay for repairs to Edwards' wife's BMW car.

57. Edwards charged **$33,839.73** in personal travel expenses to WESTGATE's credit card without WESTGATE's authorization including but not limited to locations such as Las Vegas, the Dominican Republic, Florida, Colorado, California and Cancun.

58. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for Edwards' personal travel or other travel that had nothing to do with the work he was providing for WESTGATE.

59. Edwards charged **$23,070.00** to WESTGATE's credit card for personal dining and other bar and/or restaurant charges.

60. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for Edwards' personal dining, other bar/restaurant charges or other dining use that had nothing to do with the work he was providing for WESTGATE.

61. Edwards charged **$9,228.03** to WESTGATE's credit card for personal expenses including Movers, U Hauls, dumpsters, non-WESTGATE storage facility, Health Clubs, debit charges, movies, bicycle rentals.

62. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for Edwards' personal expenses including Movers, U Hauls, dumpsters, non-WESTGATE Storage facility, Health Clubs, debit charges, movies, bicycle rentals or other use that had nothing to do with the work he was providing for WESTGATE.

63. Edwards charged **$12,882.40** to WESTGATE's credit card for gas and auto related expenses not related to the services Edwards was to provide to WESTGATE including filling multiple family cars in a single day.

7

64. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for Edwards' gas and auto related expenses or other use that had nothing to do with the work he was providing for WESTGATE.

65. Edwards, a Canadian native, charged **$22,203.09** to WESTGATE's credit card for trips to Canada including Calgary, Niagara Falls, Saskatoon, and Buffalo

66. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for Edwards' trips to Canada including Calgary, Niagara Falls, Saskatoon, and Buffalo or other use that had nothing to do with the work he was providing for WESTGATE.

67. Edwards charged **$15,465.87** to WESTGATE's credit card for non-WESTGATE travel to Chicago, Dallas, Houston, Sacramento, Wichita, Fayetteville and others.

68. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for Edwards' for non-WESTGATE travel to Chicago, Columbus, Dallas, Houston, Sacramento, Wichita, Fayetteville or other use that had nothing to do with the work he was providing for WESTGATE.

69. Edwards charged **$ 2,851.62** to WESTGATE's credit card for 1st class travel upgrades

70. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for 1st class travel upgrades or other use that had nothing to do with the work he was providing for WESTGATE.

71. Edwards charged **$ 32,431.02** to WESTGATE's credit card for phones, office supplies and equipment including family use, phones and non-WESTGATE items and expenses.

72. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for phones, office supplies and equipment including family use, phones and non-WESTGATE items or other use that had nothing to do with the work he was providing for WESTGATE nor had been approved by WESTGATE

73. Edwards charged **$8,167.28** to WESTGATE's credit card for computer software, none of which has ever been utilized by WESTGATE.

74. WESTGATE never authorized Edwards to use WESTGATE's credit card to pay for computer software that had nothing to do with the work he was providing for WESTGATE.

75. From 2015 through the termination of the agreement between WESTGATE and Edwards, Edwards charged **$224,925.01** for personal or other use that had nothing to do with the work he was providing for WESTGATE and were not authorized by WESTGATE.

### Claim 2 - Fraudulent Misrepresentation (Pack and Proper Contracts)

76. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 75 above.

77. On or about June 14, 2016, Edwards executed two separate contracts with a corporation named Pack and Proper Co., Ltd.

78. The contracts were between WESTGATE and Pack and Proper.

79. WESTGATE did not give Edwards authority to enter into these contracts.

80. No employee, officer or agent of WESTGATE was involved in the negotiations of the contract executed on behalf of WESTGATE by Edwards with Pack and Proper Co., Ltd.

81. The address used for WESTGATE on both of the contracts between Edwards and Pack and Proper Co., Ltd. is Edwards's home address.

82. Edwards executed the contracts with Pack and Proper Co., Ltd. stating that he was the "Executive Vice President of Sales" for WESTGATE.

83. Edwards has never been an employee of or held the position of "Executive Vice President of Sales" for WESTGATE.

84. Edwards had been informed on numerous occasions that he has no authority to execute any contractual commitments on WESTGATE's behalf without approval from Patrick Carroll.

85. Edwards never advised WESTGATE of the two contracts with Pack and Proper Co., Ltd.

86. After termination of the agreement between Edwards and WESTGATE, WESTGATE was informed by Pack and Proper Co., Ltd. of the existence of the contracts and informed that Pack and Proper Co., Ltd. intended to enforce the contracts.

87. The terms of the contract were in default as of December 31, 2017,

88. Edwards never informed WESTGATE that he had entered into contracts that WESTGATE was now in default of.

89. WESTGATE has no market viability for the majority of all products that were to be provided under the contracts with Pack and Proper.

90. WESTGATE's damages were caused by Edwards entering into contracts that he had no authority to sign and/or execute.

91. Pack and Proper Co., Ltd. is holding WESTGATE liable for **$58,887.00** as a result of the contracts Edwards entered into with Pack and Proper Co., Ltd.

**Claim 3 – Negligence and Fraudulent Misrepresentation (Black Bottle Caps)**

92. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 91 above.

93. Edwards developed a water bottle and bottle cap program with Berry Plastics coordinating all details with the customer.

94. Edwards was authorized to act as WESTGATE's agent to purchase all necessary bottles and caps required for the Berry Plastics program.

95. Edwards entered Purchase Orders on behalf of WESTGATE for the purchase of bottles and black bottle caps for the Berry Plastics program.

96. Edwards ordered grossly more black bottle caps than what was required per Berry Plastics bottle needs and orders.

97. Edwards ordered in excess ten bottle caps for every bottle that was required by Berry Plastics.

10

98. Edwards had a duty to WESTGATE to ensure that the correct number of black bottle caps were purchased for the Berry Plastics program based upon the equivalent amount of bottles required.

99. WESTGATE questioned Edwards in early 2017 about the number of black bottle caps that were purchased for the Berry Plastics account.

100. During this period Edwards never divulged that the enormous quantify of caps on hand was due to the fact that he ordered in excess 10 times the number of caps required by the customer.

101. In January of 2018, Edwards provided to WESTGATE a forecast indicating that WESTGATE would be able to sell the black bottle caps to Berry Plastics.

102. Upon termination of the agreement WESTGATE determined that Edwards had effectively ordered an 8 year supply of bottle caps based upon Berry Plastics actual bottle requirements.

103. After termination of the agreement between Edwards and WESTGATE, WESTGATE learned from Berry Plastics that it had not provided Edwards with the information Edwards provided to WESTGATE relative to the forecast.

104. Upon termination of the agreement WESTGATE learned that Berry Plastics was holding 600 cases of excess bottle cap stock that they wanted to return based upon Edwards's negligent ordering of black bottle caps.

105. WESTGATE attempted to return the bottle caps to the manufacturer, however, due to the fact that they were purchased over a year before, the manufacturer would not accept return.

106. Had Edwards informed WESTGATE that Edwards had negligently ordered the excessive amount of black bottle caps in a timely manner WESTGATE could have returned the product to the manufacturer.

107. The bottle caps are now obsolete as they have exceeded their shelf life date and can't be sold.

108. Edwards, as an agent of WESTGATE, had a duty to fully disclose all contracts and/or potential issues with the orders that would negatively impact WESTGATE financially.

109. Edwards violated his duty to WESTGATE by failing to disclose the mistaken order of black bottle caps.

110. Edwards, as an agent of WESTGATE, had a duty to fully disclose all information relative to WESTGATE's business; specifically, the forecast for the black bottle caps.

111. Edwards violated his duty to WESTGATE by presenting fraudulent information forecasting the sale of the black bottle caps to WESTGATE.

112. Edwards's actions resulted in **$101,000.00** of black bottle caps that cannot be sold and is a realized financial loss to WESTGATE as the cost for the black bottle caps.

113. WESTGATE's damages were caused by Edwards's failures to disclose.

### Claim 4 - Negligence and Fraudulent Misrepresentation (Red Cup Lids)

114. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 113 above.

115. Edwards, as WESTGATE's agent, contracted with Pack and Proper Co., Ltd. to produce red thermoform drink cup lids for Berry Plastics.

116. The agreement Edwards entered into with Pack and Proper Co., Ltd. for the red thermoform drink cup lids was not known by WESTGATE until after it ceased its agreement with Edwards (see Claim #2)

117. Edwards received production samples of the lid from Pack and Proper Co., Ltd. for approval.

118. Edwards did not provide the production lid samples provided by Pack and Proper to Berry Plastics for their approval.

119. Edwards approved the production samples of the lids provided by Pack and Proper without receiving approval of the production samples from Berry Plastics before authorizing Pack and Proper Co. to begin production of the lid.

12

120. The lids were received by WESTGATE in June of 2017.

121. The first shipment of the lids to Berry Plastics was rejected for poor quality, color and function.

122. Edwards, without informing WESTGATE that there was an issue with the lids, informed Berry Plastics that the lids would be replaced by WESTGATE without further cost to Berry Plastics.

123. Edwards told Berry Plastics that they would be provided an opportunity to inspect the new lid for approval before it was produced.

124. Edwards never provided a new lid sample to Berry Plastics for authorization of production of a replacement.

125. WESTGATE inquired of Edwards why there were so many red lids in stock.

126. Edwards told WESTGATE that the red lids in stock would sell and provided fraudulent forecasts for their purchase.

127. Edwards never informed WESTGATE that the red lids were defective and had been rejected by the customer.

128. Pack and Proper claims that the lids were produced in good faith and had been approved by Edwards for color, quality and function and therefore could not be rejected for credit. Because of the above circumstances,

129. Based upon the above circumstances Berry Plastics informed WESTGATE that it would not be purchasing any of the red lids from WESTGATE, opting to stay with a generic clear lid they had been using.

130. The generic clear lid is not an item sourced by WESTGATE.

131. Edwards, as an agent of WESTGATE, had a duty to fully disclose the issues with the faulty red cup lids to WESTGATE.

132. Edwards violated the duty to disclose by not informing WESTGATE of the issue with the red cup lids.

133. Edwards, as an agent of WESTGATE, had a duty to properly execute his duties, including but not limited to confirming with WESTGATE's customer that the lid was of the proper color and size.

134. WESTGATE was damaged in the amount of **$73,147.00** for the cost of the purchase of the defective red lids from Pack and Proper Co., Ltd.

135. WESTGATE's damages were caused by Edwards's failure to disclose.

136. WESTGATE's damages were caused by Edwards failure to properly execute the duties expected of him in verifying the product to be ordered for WESTGATE's customers met the customers demands and was produced to the customer's satisfaction.

### Claim 5  Lack of Due Diligence and Negligence (Fruit Tray Patent Infringement)

137. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 136 above.

138. Edwards directed WESTGATE to produce two injection molded fruit trays for WESTGATE client Bunzel/Roundy's.

139. WESTGATE contracted with a third party to build custom injection molding tools to produce the fruit trays at a cost of $30,000.00.

140. Edwards failed to identify or inform WESTGATE that the tray design that Edwards had sold to Bunzel/Roundy's was a proprietary design of DecraStone Inc.

141. WESTGATE began producing the trays and shipping them to Bunzel/Roundy's.

142. WESTGATE received a cease and desist notice from DecraStone Inc.

143. In order to prevent DecraStone Inc. from seeking additional damages against WESTGATE, WESTGATE was forced to turn over the injection tools it purchased to DecraStone Inc.

144. WESTGATE was also required to refund to Bunzl/Roundy's for all existing inventory stock Bunzl/Roundy's had in their system at a cost of $44,000.00.

14

145. Edwards, as an agent of WESTGATE, had a duty to disclose to WESTGATE that the fruit tray he advised WESTGATE to order was a proprietary design of a third-party.

146. As a result of Edwards' actions, WESTGATE incurred damages in the amount of **$74,000.00.**

147. Edwards failure to fully disclose to WESTGATE that the fruit tray design was proprietary information of a third-party was the cause of WESTGATE's damages.

## Claim 6 - Self-Dealing/ Violation of Duty of Loyalty/Unjust Enrichment (First Quality/ Wendys)

148. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 147 above.

149. The Wendy's Company (hereinafter "Wendy's") was WESTGATE's biggest customer, representing roughly 20% of WESTGATE's sales annually.

150. Edwards was responsible for WESTGATE's existing business with Wendy's and for developing new business between WESTGATE and Wendy's.

151. WESTGATE's existing business with Wendy's was the Chili Pack business that had been developed by WESTGATE directly with Wendy's before Edwards was representing WESTGATE.

152. Edwards developed the Wendy's portion cups business with Wendy's for WESTGATE while Edwards was representing WESTGATE.

153. WESTGATE's supplier for portion cups that were sold to Wendy's was First Quality.

154. Edwards put together the program that WESTGATE would buy portion cups from First Quality and WESTGATE would re-distribute and/or cross dock the portion cups with the Chili Pack product.

155. WESTGATE supported the business by opening and staffing a new 50,000 Square Foot warehouse to meet Wendy's needs.

15

156. In 2016, without WESTGATE's knowledge, Edwards began developing a 40 oz. printed drink cup for Wendy's (the "Wendy's Cup") with First Quality the producer of WESTGATE's portion cups sold to Wendy's

157. Edwards was coordinating the Wendy's Cup project with First Quality and Wendy's using an email other than the cedwards@westagteproducts.com email that he had been provided by WESTGATE.

158. Being that printing and selling drink cups was a core part of the WESTGATE business; WESTGATE would have expected that this item would have been developed in conjunction with WESTGATE while Edwards was still under agreement with WESTGATE.

159. Being that Wendy's was WESTGATE largest customer and Edwards was being compensated to grow the Wendys's business on behalf of WESTGATE; WESTGATE would have expected that this item would have been developed in conjunction with WESTGATE while Edwards was still under agreement with WESTGATE.

160. Edwards developed the Wendy's Cup with First Quality; WESTGATE's supplier of Wendy's portion cups.

161. At no time did Edwards inform WESTGATE that he was working with First Quality to develop the Wendy's Cup.

162. Being that First Quality was both WESTGATE's largest supplier and largest supplier of products sold to Wendy's; WESTGATE would have expected that this item would have been developed in conjunction with WESTGATE while Edwards was still under agreement with WESTGATE.

163. Edwards and First Quality began shipping orders of the Wendy's Cup to Wendy's in 2018.

164. Edwards developed this business between himself, First Quality and Wendy's while under the agreement between himself and WESTGATE.

16

165. Wendy's open order reports were listing the 40oz cups orders as having originated through WESTGATE.

166. WESTGATE never received any benefit associated with Wendy's Cup developed with First Quality for Wendy's.

167. After WESTGATE's termination of the agreement with Edwards; WESTGATE discovered that Edwards had entered into a representation agreement with First Quality while still representing WESTGATE that was in conflict and detrimental to WESTGATE related to products and markets Edwards was already representing on behalf of WESTGATE and in conflict with WESTGATE's current customer base, products and markets including Wendy's.

168. Edwards never disclosed to WESTGATE that he entered into a representation agreement with First Quality while still representing WESTGATE that was in conflict and detrimental to WESTGATE related to products and markets Edwards was already representing on behalf of WESTGATE and in conflict with WESTGATE's current customer base, products and markets including Wendy's.

169. After termination of the agreement between Edwards and WESTGATE, WESTGATE was informed by Wendy's that Edwards, and or a company owned in whole or in part by Edwards, was going to be awarded the WESTGATE contract to distribute Wendy's portion cups which was business Edwards had negotiated between First Quality, Wendy's and WESTGATE while Edwards was under agreement with WESTGATE.

170. After termination of the agreement between Edwards and WESTGATE, WESTGATE was informed by Wendy's that Edwards, and or a company owned in whole or in part by Edwards, was going to be awarded the WESTGATE contract to assemble Chili Pack parts which was business WESTGATE had secured with Wendy's prior to the

17

WESTGATE/Edwards agreement and had been negotiated exclusively between Wendy's and WESTGATE.

171. Upon termination of the agreement with WESTGATE and Edwards; WESTGATE was informed by Wendy's that Edwards would be supporting the Wendy's Chili Pack and Portion cup business out of a warehouse operation that Edwards had set up in Missouri under the name Veripac.

172. Edwards was being compensated to manage both the Chili Pack and Portion Cup Business with Wendy's by WESTGATE as part of his compensation.

173. Edwards used WESTGATE's proprietary information, including pricing information and proprietary internal cost modeling information to obtain Wendy's portion cup and chili bucket business.

174. Edwards used WESTGATE's proprietary information, including pricing and proprietary internal cost modeling information, to direct Wendy's business away from WESTGATE to himself and/or corporations owned, in whole or in part, by Edwards.

175. Edwards used relationships developed and enhanced with First Quality and Wendy's while under agreement with WESTGATE to develop products that WESTGATE should have been commercially responsible for.

176. Edwards entered into a representation agreement with First Quality while still representing WESTGATE that was in conflict and detrimental to WESTGATE related to products and markets Edwards was already representing on behalf of WESTGATE and in conflict with WESTGATE's current customer base, products and markets including Wendy's.

177. Edwards, as an agent of WESTGATE, had a duty to disclose to WESTGATE that he was developing business with First Quality for Wendy's that was in conflict with WESTGATE's business with Wendy's.

18

178. Edwards, as an agent of WESTGATE, had a duty of loyalty to WESTGATE not to divert WESTGATE business to himself during the course of the agreement between WESTGATE and Edwards.

179. Edwards, as an agent of WESTGATE, had a duty of faithfulness to WESTGATE while under the agreement between WESTGATE and Edwards.

180. Edwards violated his duty to fully disclose to WESTGATE that, while under the agreement between Edwards and WESTGATE, he was developing a product to compete with WESTGATE's business with Wendy's.

181. Edwards, as an agent of WESTGATE, violated his duty of loyalty to WESTGATE as he, while under the agreement between Edwards and WESTGATE, developed a product to compete with WESTGATE's business with Wendy's.

182. Edwards violated his duty of faithfulness to WESTGATE by, while under the agreement between Edwards and Westgate, developing a product to compete with WESGATE's business with Wendy's.

183. WESTGATE was damaged by Edwards's self-dealing and/or violating his duty of loyalty to WESTGATE.

184. Edwards was unjustly enriched by his self-dealing and/or his violating his duty of loyalty to WESTGATE.

185. WESTGATE suffered damages by Edwards's self-dealing and violating his duty of loyalty to WESTGATE in an amount to be determined at trial.

186. WESTGATE's damages were caused by Edwards's breach of full disclosure.

187. WESTGATE's damages were caused by Edwards's breach of duty of loyalty.

188. WESTGATE's damages were caused by Edwards's breach of faithfulness.

**Claim 7-Business Damages to WESTGATE Key Contacts, Supplier and Customer's
(Self Dealing and Violation of Duty of Loyalty (Wendy's Cup)**

189. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 188 above.

190. The Edwards development of the Wendy's 40oz cup with First Quality also caused
WESTGATE undue hardships and damages as it related WESTGATE's existing key
contacts, suppliers and customers.

### Pactiv Corporation Conflicts

191. The Wendy's 40oz cup was an item supplied by Pactiv Corporation

192. In November 2017 WESTGATE was in negotiations with Pactiv Corporation to explore
supply agreements, joint ventures or other commercial opportunities.

193. WESTGATE specifically asked Edwards if he was working on any business that would be
considered a conflict or detrimental to WESTGATE's Pactiv discussions.

194. Edwards represented he was not working on any business associated with Pactiv that would
be in conflict with WESTGATE/Pactiv dealings.

195. Edwards, as an agent of WESTGATE, had a duty to fully disclose any business that may be
in conflict with WESTGATE/Pactiv dealings.

196. In November of 2017, Edwards upon questioning informed WESTGATE that he had
divulged the nature of WESTGATE's commercial discussions with Pactiv to Wendy's which
immediately violated the Non Disclosure Agreement (NDA) that WESTGATE/Pactiv
executed.

197. WESTGATE was required to disclose to Pactiv that the NDA had been breached by
Edwards.

198. After WESTGATE terminated the Edwards relationship and it was discovered that
Edwards/First Quality were developing a 40oz cup for Wendy's; WESTGATE was required

by the NDA agreement to disclose that this item was developed by Edwards while he was still a WESTGATE representative during the coordination of the program.

199. Edwards violated his duty to disclose by failing to inform WESTGATE that he developed business in conflict of the business between WESTGATE and Pactiv.

200. WESTGATE currently has not enjoyed any new business opportunities through Pactiv and, as a result, WESTGATE has suffered damages in an amount to be determined at trial.

201. Edwards' failure to disclose his breach of WESTGATE's non-disclosure agreement is the cause of WESTGATE's damages resulting from Pactiv's failure to continue to pursue commercial opportunities with WESTGATE.

### Berry Corporation Conflicts

202. Berry Plastics is a both a large supplier and customer of WESTGATE Products for drink cups and other products and is considered by WESTGATE to be an extremely key strategic partner.

203. Edwards never disclosed to WESTGATE that he was developing a 40oz drink cup that Berry would consider to be in direct competition to product that Berry sells to WESTGATE and others.

204. Any damage to the WESTGATE/Berry partnership would be extremely detrimental to WESTGATE.

205. The 40oz drink cup developed by Edwards/First Quality for Wendy's is considered by Berry Plastics to be directly in conflict with their main drink cup product line.

206. Upon discovery that the 40oz cup had been developed by Edwards/First Quality: WESTGATE needed to disclose to Berry Plastics that the cups which would compete with their product line had been developed by Edwards while he was a representative of WESTGATE.

21

207. Edwards, as an agent of WESTGATE, had a duty to fully disclose any and all business dealings which may negatively impact WESTGATE's business.

208. Edwards, as an agent of WESTGATE, owed a duty of loyalty to WESTGATE to not compete with WESTGATE's interests while under the agreement between WESTGATE and Edwards.

209. Edwards violated his duty to disclose to WESTGATE that he was competing with WESTGATE's business while under the agreement between WESTGATE and Edwards.

210. Edwards violated his duty of loyalty by competing with WESTGATE's business while under the agreement between WESTGATE and Edwards.

211. WESTGATE suffered damages as a result of Edwards's actions in an amount to be determined at trial.

212. Edwards's violation of his duty to disclose caused damages to WESTGATE.

213. Edwards's violation of his duty of loyalty cause damages to WESTGATE.

**Claim 8 - Self -Dealing and Violation of Duty of Loyalty (Commission Kickbacks)**

214. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 213 above.

215. Edwards, as an agent of WESTGATE, negotiated supply agreements for key customer inventory items with First Quality and Stronghaven.

216. The items negotiated by Edwards on behalf of WESTGATE with First Quality and Stronghaven were purchased to support items supplied to Wendy's

217. On information and belief, Edwards agreed to pay inflated prices for products purchased by WESTGATE from First Quality and Stronghaven.

218. On information and belief, Edwards received direct or indirect commission or fees from First Quality and Stronghaven for items purchased by WESTGATE.

219. On information and belief, Edwards entered into a representation agreement with First Quality while still representing WESTGATE that was in conflict and detrimental to

22

WESTGATE related to products and markets Edwards was already representing on behalf of WESTGATE and in conflict with WESTGATE's current customer base, products and markets.

220. Edwards, as an agent of WESTGATE, had a duty to fully disclose to WESTGATE any agreements he had to be paid by WESTGATE's suppliers while under the agreement between WESTGATE and Edwards.

221. Edwards, as an agent of WESTGATE, owed a duty of loyalty and faithfulness to WESTGATE to not self-deal while under the agreement between WESTGATE and Edwards.

222. Edwards never disclosed to WESTGATE that he was receiving payments from First Quality and/or Stronghaven for items purchased by WESTGATE.

223. Edwards never represented to WESTGATE that he entered into a representation agreement with First Quality while still representing WESTGATE that was in conflict and detrimental to WESTGATE related to products and markets Edwards was already representing on behalf of WESTGATE and in conflict with WESTGATE's current customer base, products and markets.

224. Edwards never disclosed to WESTGATE that he was receiving payments from First Quality and/or Stronghaven for items purchased by WESTGATE.

225. WESTGATE was damaged by Edwards's self-dealing and/or violating his duty to disclose and duty of loyalty and faithfulness to WESTGATE.

226. Edwards was unjustly enriched by his self-dealing and/or his violating his duty to disclose and duty of loyalty and faithfulness to WESTGATE.

227. WESTGATE suffered damages as a result of Edwards's actions in an amount to be determined at trial.

228. WESTGATE's damages were caused by Edwards' violation of his duty to disclose and/or his duty of loyalty and faithfulness.

### Claim 9 - Self-Dealing and misrepresentation (CoreMark)

229. Plaintiffs reallege and incorporates as if fully stated herein paragraphs 1 to 228 above.

230. Edwards coordinated the sourcing and selling of various plastic and paper cup products to CoreMark Corporation in Calgary Canada.

231. Edwards purchased and excessive amount of paper and plastic products to support the CoreMark Account.

232. After termination of the agreement between Edwards and WESTGATE, WESTGATE was informed by CoreMark that Edwards, and or a company owned in whole or in part by Edwards, was going to be awarded the CoreMark contracts.

233. Upon termination of WESTGATE's agreement with Edwards, Edwards and CoreMark notified WESTGATE that they would purchase the remaining WESTGATE inventory that Edwards had purchased for CoreMark but only at WESTGATE's cost with no earnings value to WESTGATE.

234. After the termination of WESTGATE's agreement with Edwards, Edwards failed to order all the remaining inventory on WESTGATE's floor that Edwards had committed to purchase.

235. Upon termination of the agreement with Edwards, WESTGATE learned that Edwards had marketing expenses, price reductions and discounts to CoreMark Corporation for products ordered from WESTGATE by CoreMark.

236. Edwards sponsored golf tournaments, approved marketing expenses and granted price reductions and discounts to CoreMark Corporation (hereinafter CoreMark) a WESTGATE customer without WESTGATE's consent or approval.

237. Edwards was not authorized to extend these sponsorships, marketing expenses or price concessions by WESTGATE.

238. Edwards was unjustly enriched by his self-dealing, mis-representation and lack of disclosure.

239. WESTGATE suffered damages in the amount of **$62,898.00** as a result of Edwards's actions.

Westgate does not request a Jury Trial.

**WHEREFORE**, the Plaintiffs respectfully request:

A. For monetary damages in the amount of $609,862.37 plus additional money damages to be determined at trial.

B. For recovery of all costs, disbursements and attorneys' fees incurred in defending Plaintiff's claims; and

C. For such other and further relief the Court deems just and equitable.

Dated February 18, 2019

**SITZMANN LAW FIRM LTD**
Attorneys for Plaintiffs

Andrew C. Micheletti
WI Bar Member No.: 1075923
231 W. Franklin Street
Appleton, WI 54911
Phone: (920) 733-3963
Facsimile: (920) 733-8873
Email: andrew@sitzmannlaw.com

Christopher G. Sitzmann
WI Bar Member No.: 1011491
231 W. Franklin Street
Appleton, WI 54911
Phone: (920) 733-3963
Facsimile: (920) 733-8873
Email: csitzmann@sitzmannlaw.com

25